IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

PINION ENTERPRISES, INC., d/b/a )
the Gun Cellar, an Alabama )
Corporation, )
)
PLAINTIFF/PETITIONER )
)
VS. ) 2:04-cv-2638-JHH
)
JOHN ASHCROFT, Attorney )
General of the United States, )
UNITED STATES DEPARTMENT )
OF JUSTICE and THE BUREAU )
OF ALCOHOL, TOBACCO, )
FIREARMS AND EXPLOSIVES, )
)
DEFENDANTS/RESPONDENTS )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Factual Background and Procedural History

Thomas Pinion ("Petitioner"), the principal stockholder of Pinion Enterprises Inc., d/b/a "The Gun Cellar," individually held a federal firearms license for nineteen years. In 1999, Petitioner incorporated his business and was granted a federal firearms license under the name of Pinion Enterprises, Inc. (Gov. Ex. 1).[1] During the time Petitioner held a federal firearms license, he was subject

---

[1] Citations to exhibits refer to evidence presented during the hearing before Hearing Officer Teresa R. Cole. Any supplemental exhibit containing new evidence received by this Court will be noted as "Supp. Ex."

to regular inspections, and on five occasions prior to the 2000 inspection, he was cited for violations similar to those at issue here.[2] (Tr. at 474-475).[3]

On April 26, 1983, Petitioner was cited for improperly recording firearms transactions into his Acquisitions and Dispositions ("A & D") book, as well as selling firearms at a location other than his place of business. (Gov. Ex. 26; see also Tr. at 487). On September 19, 1989 (Gov. Ex. 19; Tr. at 482-484); July 30, 1993 (Gov. Ex. 24); January 5, 1995 (Gov. Ex. 23); and August 5, 1999 (Gov. Ex. 16; see also Tr. at 477-478), Petitioner received similar citations regarding his failure to properly maintain records for his firearms transactions. Petitioner acknowledges each of the referenced violations and concedes that he was instructed on how to avoid similar problems in the future. (Tr. at 473-475). With regard to the 1989 violations, Petitioner received a letter and attended a conference to help him comply with federal firearms regulations. (Gov. Ex. 20). In conjunction with the 1999 inspection, Petitioner met with inspector Linda

---

[2] While Petitioner contests the findings of the 2000 inspection leading to this proceeding, he concedes he was in violation of the rules the other times he received citations.

[3] In his brief, Petitioner cites to the unofficial transcript, whereas Respondent cites to the official transcript. When at all possible, to avoid confusion, the Court will cite to the official transcript, noted as "Tr." However, when necessary, the Court will reference the unofficial transcript, noted as "Un. Tr." Petitioner relies heavily upon the findings of fact by the Hearing Officer. Although the officer's report is useful for providing background, because review is *de novo*, this Court affords no special weight to the officer's findings of fact and will, where possible, rely directly upon the transcript.

Schmoel at his store, and they discussed his violations and ways to improve compliance. (Tr. at 477-480). Around the same time period, Petitioner attended yet another compliance conference. (Gov. Ex. 17; see also Tr. at 372). Notably, pursuant to his second conference, Petitioner received a letter which admonished that "[r]epeat violations . . . will be viewed as willful, and may result in revocation." (Gov. Ex. 17).

Between October 30, 2000, and November 8, 2000, Inspectors Mawhinney and Majors conducted compliance inspections at "The Gun Cellar." (Tr. at 36). The inspectors discovered that Petitioner had sixty-eight guns on his premises for repair work, which he had not properly logged into his A & D book.[4] (Gov. Ex. 11; see also Tr. at 44-45). The inspectors also found that Petitioner failed to properly log the disposition of 187 firearms in his A & D book. (Gov. Ex. 8; see also Tr. at 48-50). Finally, the inspectors concluded that Petitioner had not properly completed ATF Forms 4473 for the disposition of eighty firearms. (Gov. Ex. 9; see also Tr. at 55).

As a result of the 2000 compliance inspection, on January 14, 2002, Harry

---

[4] The testimony of the inspectors and Petitioner directly conflict as to how this number was reached. Petitioner contends he played no part in the inspection nor did he give the inspectors any instruction with regard to the unrecorded guns. (Un. Tr. at 326-327). On the other hand, Inspector Mawhinney testified that Petitioner told them that the guns in for repair were not in the A & D book and actually showed them those guns. (Tr. at 42). Inspector Majors also testified that Petitioner took part in the inventory. (Tr. at 290).

L. McCabe, Director of Industry Operations Nashville Field Division, issued a Notice of Revocation of License. (Gov. Ex. 2). On January 24, 2002, pursuant to 18 U.S.C. 923(f)(2), Petitioner requested a hearing to review the revocation of his license. (Pet. Ex. A at 2). The hearing was held on December 3, 2002, and February 19, 2003, before Special Operations Inspector Teresa R. Cole. (Pet. Ex. A at 3). The license revocation was based upon Petitioner's willful failure to properly record the acquisition of seventy-seven firearms pursuant to §§ 922(m), 923(g), and 27 C.F.R. § 478.125(e) (Count I); Petitioner's willful failure to properly record the disposition of 187 firearms pursuant to §§ 922(m), 923(g), and 27 C.F.R. § 478.125(e) (Count II); Petitioner's willful failure to properly record transfers of firearms on ATF Forms 4473 pursuant to §§ 922(m), 923(g), and 27 C.F.R. § 478.124(c) (Count III). (Pet. Ex. A at 3).[5]

Inspector Cole prepared a memorandum containing findings of fact and recommended that Petitioner's license not be revoked because the evidence was insufficient to show that Petitioner's violations were willful. Inspector Cole found that Respondent's evidence was limited solely to the testimony of the inspectors

---

[5] During the November 2000 inspection, Petitioner was cited for nine violations. However, at the hearing Respondents chose to base the license revocation only upon the three counts included above. Accordingly, the three violations formally relied upon by Respondent at the hearing are the only ones before the Court.

with regard to each violation at issue. (Pet. Ex. A at 15-18). Inspector Cole noted that Petitioner presented testimony which contradicted that of the Inspectors Mawhinney and Majors, and there was no specific documentation detailing which guns were out of place or improperly logged into the A & D book. (Pet. Ex. A at 15-18).

On July 6, 2004, after reviewing Inspector Cole's memorandum, Harry McCabe, Director of Industry Operations, rejected Cole's recommendation and concluded that the evidence presented was sufficient and that Petitioner's violations were willful as defined by case law. (Pet. Ex. B "Findings of Fact and Conclusions of Law"). Accordingly, McCabe revoked Petitioner's license. Consistent with the provisions of § 923(f)(3), on September 1, 2004, Petitioner filed a Complaint in this Court requesting *de novo* review of the Attorney General's decision.

The Court now has before it Petitioner's brief, filed April 1, 2005, in support of his contention that the decision of the Attorney General should be overruled. In addition, the Court also has Respondents' response, filed April 27, 2005; Petitioner's reply brief, filed May 30, 2005; and the supplemental evidence offered by both parties. The Court has reviewed the briefs, the evidence and the

transcript of record, and the case is now under submission.[6]

## Standard of Review

Section 923(f)(3) provides that the Attorney General's decision to revoke a license to sell firearms is subject to "*de novo*" review in the United States district court for the appropriate district.[7] In exercising its responsibility of *de novo* review, the district court "may consider any evidence submitted by the parties to the proceeding whether or not such evidence was considered," at the original hearing held pursuant to § 923(f)(2).[8] Although the district court is free to receive new evidence and hold an evidentiary hearing, the language of the statute is

---

[6] While some courts have characterized a party's motion under § 923(f)(3) as one for "summary judgment," See e.g., DiMartino v. Buckley, 19 Fed. Appx. 114, 115, No. 01-1166, 2001 WL1127288, at *1 (4th Cir. Sept. 25, 2001), Cook v. Herbert, No. Civ.A. 5:03CV00042, 2004 WL 40525, at * 1 (W.D. Va. Jan. 5, 2004), this designation may confuse the issues and is not apposite. As recognized in Stein's v. Blumenthal, under the traditional summary judgment standard, "technically fact finding is inappropriate and all reasonable inferences must be draw in favor of the party opposing the motion." 649 F.2d 463, 468 n.7 (7th Cir. 1980). In contrast, § 923(f)(3) authorizes the district court to hear any evidence it wishes and make findings of fact, even without the benefit of conducting an evidentiary hearing. Id. at 466 ("The ultimate decision as to the law and the facts remains with the trial judge."). Thus, while the Court's decision may be "summary" in nature as a matter of form, procedurally the Court may issue a decision even if material issues of fact exist, based upon its evaluation of the record and any additional evidence it has received.

[7] Section 923(f)(3) was amended in 1986 to add the word "*de novo*" before "judicial review." Prior to the 1986 amendment, the word "*de novo*" was present in the legislative history, and some courts had interpreted the statute to require *de novo* review, while others chose to give deference to the decision of the administrative agency. Compare Stein's, 649 F.2d at 466 and McLemore v. U.S. Treasury Dept., 317 F. Supp. 1077, 1078-1079 (N.D. Fl. 1970).

[8] If the Court does accept new evidence "it may chose to receive the evidence in the form of affidavits rather than testimony." Stein's, 649 F.2d at 466 n.5.

permissive, and the court is not bound to do either.[9] DiMartino, 19 Fed. Appx. at 116; Cucchiara v. Sec. of Treasury, 652 F.2d 28, 30 (9th Cir. 1981); Stein's, 649 F.2d at 466; Willingham Sports Inc. v. BATF, 348 F. Supp. 2d 1299, 1307 (S.D. Al. 2004).

Regardless of what process the court chooses to follow, the statute only allows the district court to reverse the Attorney General's decision if it finds "the Attorney General was not *authorized* to . . . revoke the license." § 923(f)(3) (emphasis added); see also Cisewski v. Dept. of Treasury, 773 F. Supp. 148, 150 (E.D. Wis. 1991). The language of § 923(f)(3) does not call upon this Court to decide whether it would revoke the license in it's own judgment, but whether all of the evidence presented is sufficient to justify the Attorney General's revocation of the license.[10]

---

[9] While there is no binding precedent which dictates when an evidentiary hearing is appropriate, this Court agrees with the language of Stein's. In Stein's the court noted that a hearing is only necessary "when some good reason to do so either appears in the administrative record or is presented by the party petitioning for judicial review." 649 F.2d at 466. The Stein's court went on to reason that "*de novo*" review as required by § 923(f)(3) is not synonymous with a "trial *de novo*," and held that "[c]onsiderations of judicial economy suggest that the trial anew of factual matters already litigated should be avoided unless substantial doubt infects the agency's findings of fact." Id. Furthermore, where an evidentiary hearing is necessary, "the party petitioning for review should clearly set forth in the complaint those findings which he intends to challenge." Id. at 466 n.4. Here, while Petitioner challenges the sufficiency of the evidence, he does so (with one exception) on the basis of evidence already contained in the record. Accordingly, there is no need to conduct an evidentiary hearing.

[10] It is important to note that this Court, consistent with the other recent cases addressing § 923(f)(3), is not giving any special deference to the decision of the Attorney General. See e.g.,

## Applicable Law and Substantive Analysis

Petitioner is charged with violating §§ 922(m), 923(g) and 27 C.F.R. §§ 478.125(e), 478.124(c). Section 922(m) makes it unlawful for a licensee to knowingly make a false or incorrect entry into or improperly maintain records that he is required to keep by federal regulations. Section 923(g) overlaps § 922(m) and requires that a licensee keep all records as prescribed by federal regulations. Federal Regulation § 478.125(e) outlines the specific way in which a licensee is to record and maintain acquisitions and disposition of firearms. Section 478.124(c) provides that all over the counter transfers of firearms are to be recorded on ATF Form 4473 and outlines the process by which the forms are properly completed.

Section 923(e) authorizes the Attorney General to revoke a licensee's federal firearms license when he "willfully" violates "any provision" of the federal firearms regulations. A violation of any of these provisions may be considered willful "when a dealer understands the requirements of the law, but knowingly fails to follow them or was indifferent to them." Perri v. Dept. of Treasury, 637 F.2d 1332, 1336 (9th Cir. 1981); accord Stein's, 649 F.2d at 467; Lewin v.

---

Willingham, 348 F. Supp. 2d at 1306. Cases undoubtedly exist where the Attorney General is authorized to revoke a license and does so, whereas given the same facts and evidence this Court on its own might not have made the same decision. Regardless, as discussed *supra*, the Court's role here is to decide whether the Attorney General's decision to revoke was within it's legitimate authority, not whether its was the most prudent exercise of power.

Blumenthal, 590 F.2d 268, 269 (8th Cir. 1979); Willingham, 348 F. Supp. 2d at 1309. It is not necessary that a licensee act with a "bad purpose or evil motive." Stein's, 649 F.2d at 467. Evidence that a licensee repeatedly violated federal firearms regulations "after being advised of recordkeeping defects . . . on prior occasions," is sufficient to show willfulness. Willingham, 348 F. Supp. 2d at 1310; see also Breit & Johnson Sporting Goods, Inc. v. Ashcroft, 320 F. Supp. 2d 671, 678 (N.D. Ill. 2004).

Petitioner argues that the evidence introduced at the hearing regarding Count I was insufficient to prove that he willfully failed to properly record the disposition of sixty-eight firearms. To support his argument, Petitioner points to the conclusion of the hearing officer and contends that Respondent did not offer any evidence illustrating how the inspection was conducted or whether the count was accurate. In particular, Petitioner takes issue with the number of un-logged acquisitions. Citing to the Hearing Officer Cole's Report, Petitioner claims in his brief to have presented "uncontroverted testimony . . . that the acquisition of all firearms had been appropriately logged." (See Pet. Ex. A at 16).

Contrary to Petitioner's argument, Inspector Mawhinney, indeed gave a thorough description of what process is typically followed in order to determine whether a licensee's A&D book is consistent with his inventory. (Tr. 39-42).

Immediately after Mawhinney described his standard operating procedure, he indicated that his inspection of Petitioner's business revealed seventy-seven unrecorded acquisitions. (Tr. at 42-45). Respondent also produced the worksheet on which Inspector Mawhinney noted the un-logged seventy-seven firearms. (Gov. Ex. 11). The document is dated November 8, 2000, and Mr. Pinion's signature appears on the lower left hand corner. (Gov. Ex. 11).

The Court acknowledges that how the original number of seventy-seven was reached, and how that number was later reduced at the administrative hearing to sixty-eight is not clear. However, despite Petitioner's zealous contention of having offered "uncontroverted" evidence and his attacks on the accuracy of the inspectors' firearms count, the record reveals that at least some guns were not logged in.[11] Petitioner himself testified that he had thirty-nine "junk" guns, which had originally been dropped off for repair, but since been abandoned, that were not

---

[11] Part of the testimony to which Petitioner refers is that of Peter Morris, Petitioner's gunsmith. Mr. Morris testified that those guns in for repair were logged into a ledger that did not contain the proper information to qualify as an A & D book. (Tr. at 650). However, according to Mr. Morris, in June of 2000, he transferred the information on all of the mentioned guns to a proper A & D book. (Tr. at 652). During the inspection, Mr. Morris was never asked to produce this A & D book, which was apparently separate from the general inventory A & D book. (Tr. at 653). While this testimony might support the conclusion that the inspectors never saw the proper book for a certain number of repair guns, it does not change the fact that Petitioner himself admits to having a number of "junk" guns laying on the table that were unrecorded. (Tr. at 394). Furthermore, Inspector Mawhinney's testified that at the outset of the inspection that Petitioner told them that his repair and gunsmith guns were not logged into the A & D book. (Tr. at 41-45). This is entirely consistent with Petitioner's own admission concerning the "junk" guns.

logged in. (Tr. at 394). Petitioner contends that Inspector Mawhinney and himself disagreed as to the actual number of these guns, but Petitioner concedes that he told Inspector Mawhinney that they were not logged in anywhere. (Tr. at 393-394; see also Tr. at 42-43). Additionally, shortly after the inspectors left, Petitioner did his own recount and testified that "Pete finished out the gunsmith log." (Tr. at 512). This is consistent with the fact that some gunsmith or "junk" guns were not in fact logged in. In short, even if there were only thirty-nine "junk" guns not logged in, this still constitutes a violation of the regulations and provides sufficient basis from which the Director of Operations could have revoked Petitioner's license.

There was also sufficient evidence to conclude that Petitioner's violations in Count I were willful. As noted earlier, it is well established in the context of firearms license revocation, that a history of repeated violations, coupled with adequate knowledge and understanding of the applicable requirements, is sufficient to establish willfulness. See e.g., Stein's, 649 F.2d at 467 (willfulness found where evidence showed plaintiff had repeatedly and consistently violated record keeping requirements); see also Article II Gun Shop, Inc. v. Ashcroft, No. 03 C 4598, 2005 WL 701053, at * 5 (N.D. Ill. Mar. 25, 2005); 3 Bridges, Inc. v. U.S., 216 F. Supp. 2d 655, 658-659 (E.D. Ky. 2002); Willingham, 348 F. Supp. 2d

at 1310-1311.[12] As outlined in the Court's review of the factual background, Petitioner received citations on five previous occasions. Petitioner doesn't contest any of these instances and admits to having been warned and to having his violations explained to him. Even more compelling is the fact that Petitioner attended meetings on two occasions where he was educated as to how to avoid further violations. Given Petitioner's long history as a license holder, his repeated failure to comply with regulations and his admitted understanding of the rules, the evidence was sufficient for the Attorney General to have concluded that the violations were willful.

Because the charges in Count I are alone sufficient to sustain the Attorney General's decision to revoke Petitioner's license, the Court's analysis need go no further. See DiMartino v. Buckles, 129 F. Supp. 2d 824, 832 (D. Md. 2001) aff'd

---

[12] Case law is replete with scenarios similar to the case at bar, where the Attorney General's revocation was justified under similar circumstances. A prime example is Willingham. 348 F. Supp. 2d 1299. In Willingham, a gun shop owner was inspected and cited for violations in 1990, 1992 and 1999 for failure to properly record acquisition and disposition information and failure to properly complete Forms 4473 for numerous firearms. Id. at 1302-1303. After the 1999 inspection, the ATF sent Willingham a letter advising him that "[r]epeat violations of those listed above will be viewed as willful." Id. at 1303. In 2001, Willingham's shop was again inspected, and similar violations were found. Id. As a result Willingham's application for renewal of his license was denied. Id. at 1304 n.7. On review, the District Court for the Southern District of Alabama, characterized the evidence of willfulness as "overwhelming." Id. at 1310. The Willingham court noted that Willingham was aware of the regulations, that he had been in the firearms business for fourteen years, had a poor record of compliance and had been repeatedly warned by the ATF. Id. The Willingham court concluded that given the evidence, "the *only* inference that this record will admit is that Willingham purposely disregarded or was indifferent to his" legal obligations. Id. at 1311.

19 Fed. Appx. 114, No. 01-1166, 2001 WL1127288 (4th Cir. Sept. 25, 2001) ("Any single violation of the federal statutes or regulations controlling the firearms industry can be a basis for . . . revoking an existing license.). However, it is worth noting that Petitioner concedes he is guilty of the violations in Count III and acknowledges that he was aware of the requirements regarding Forms 4473, prior to the 2000 inspection. (Tr. at 385; 467-469).[13] Even without the Court's finding as to Count I, the Attorney General was still authorized to revoke Petitioner's license, based solely on the violations contained in Count III. See § 923(e). With respect to Count II, the parties' evidence does not present a clear picture of what actually happened.[14]  Nevertheless, because the violations in

---

[13] As an explanation of the errors on Forms 4473, Petitioner offers that "we just weren't careful enough." (Tr. at 385). Petitioner contends that of the eighty cited violations, sixty-two were only violations because the words "yes" or "no" were replaced with "y" or "n." According to Petitioner these violations are *de minimis* and form an insufficient basis for license revocation. Petitioner's "white heart, empty head," argument as regards Count III is without merit. As an initial matter the Court notes that even by Petitioner's count, there were eighteen Forms 4473 that were incorrect for reasons other than use of "y" or "n." Some of these forms contained incomplete information as well as incorrect information. (See Gov. Ex. 9). In addition, as Respondent points out, Petitioner may not choose which regulations are important and which ones are not. It is irrelevant that Petitioner's violations were minor infractions. As the Willingham Court explained, "[i]t is not the place of . . . any licensee to decide unilaterally which federal firearms regulations are sufficiently importunate to follow and which may be disregarded." 348 F. Supp. 2d at 1309.

[14] There was testimony from Inspector Mawhinney that he found 187 open entries in the A & D book. (Tr. at 48; 226-228; see also Gov. Ex. 8). Petitioner points to the random sampling conducted by the inspectors, (Un. Tr. at 464; Tr. at 270-276), and notes that Inspector Mawhinney conceded that they found no missing guns or A&D entries during the sampling. (Un. Tr. at 464). Petitioner argues that this result is entirely inconsistent with Respondents finding of 187 open entries. In support of his argument, Petitioner presents the affidavit of a professor of

Counts I and III were sufficient for revocation, the Court makes no finding of fact or conclusion of law regarding Count II, which the Court views as superfluous.

## Conclusion

Under § 923(e), the Attorney General is authorized to revoke a firearms license for *any willful violation*. Having concluded that the evidence was sufficient to prove that Petitioner was guilty of the violations in Counts I and III, and that those violations were willful, this Court holds that the Attorney General was authorized to revoke Petitioner's federal firearms license. A separate ORDER consistent with these findings of fact and conclusions of law will be entered this day.

DONE this the 3rd day of June 2005.

_____
SENIOR UNITED STATES DISTRICT JUDGE

---

quantitative methods, who claims that if there were actually 187 discrepancies out of 789 possible A & D entries, then the odds of a random sampling of fifty with no errors is approximately eight in ten million. (Pet. Supp. Ex. 1). Petitioner's point is well taken. However, the testimony as to how many samples were actually taken is unclear. See (Un. Tr. at 464; Tr. at 271-273; L. Ex. 1). Accordingly, because the actual number of samples taken is uncertain, Petitioner's expert testimony is of little use. Regardless, as noted above, the Court draws no conclusion as to Count II since Counts I and III, individually or combined, provide sufficient basis for the Attorney General's decision.